Filed 7/16/15  Marriage of Furrh CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re the Marriage of GAIL K. and OTHAR DEAN FURRH. | D064756 |
| GAIL K. FRICK,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>OTHAR DEAN FURRH,<br><br>    Defendant and Appellant. | (Super. Ct. No. D506467) |

APPEAL from a judgment of the Superior Court of San Diego County, Alan B. Clements (Ret.), Judge.  Reversed in part; affirmed in part.

Niddrie Fish & Addams and David A. Niddrie for Defendant and Appellant.

Sharron Voorhees for Plaintiff and Appellant.

Othar Dean Furrh appeals and Gail Frick cross-appeals following a judgment on reserved reimbursement issues under Family Code section 2640 in their marriage dissolution action.[1]

A judgment of dissolution was entered in December 2009, and the parties thereafter entered into several stipulations concerning the distribution of their assets subject to reimbursement after trial on certain remaining stipulated issues. A trial on the reserved issues was held in May 2013, and the trial court filed its statement of decision on October 31, 2013, after considering the parties' objections.

This appeal and cross-appeal concern several of the reserved reimbursement issues decided by the trial court. As we will explain, we determine that the only meritorious argument is Frick's cross-appeal from the trial court's ruling that Furrh is entitled reimbursement of $50,000 for his separate property contribution to real property purchased by Frick's parents before the parties' marriage. We therefore reverse that ruling, and in all other respects we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Assets Held at the Time of Marriage*

Frick and Furrh were married on September 30, 1995, and separated on November 16, 2007. At the time of their marriage, Frick and Furrh were near retirement age and both had separate property assets. Furrh's wealth was primarily held in the form

---

[1]      Unless otherwise indicated, all further statutory references are to the Family Code.

2

of real estate, which included his residence and several income-producing rental properties. Frick's wealth was primarily held in the form of money, securities and three real properties. Frick had inherited much of her wealth shortly before marriage after the passing of her parents and her aunt and uncle.[2] According to the analysis of available documentation conducted by Frick's expert witness accountant, John R. Cooper, Frick had liquid assets at the date of marriage (including securities) in the amount of $2,888,178. Furrh's liquid assets at the date of marriage were $227,689.[3]

In 1996, the parties combined many of their liquid assets into a single brokerage account held at Jack White & Co. ("the Jack White account"), which the parties opened together as a joint account and to which both had access.[4] Much of the initial funding for the Jack White account came from the sale or transfer of Frick's securities. Cooper determined that the sale of these securities yielded $1,876,461, which funds were deposited into the Jack White account. According to Cooper, Furrh also liquidated

_____

[2] One of the three real properties owned by Frick at the at the time of the marriage (330 S. Horne St.) was an income-producing rental property, which Frick had obtained from Furrh shortly before the marriage through a like-kind exchange (26 U.S.C. § 1031) for a property (260 Diamond St.) she inherited from her parents. Another real property held by Frick was a vacation home in Borrego Springs, which she inherited from her parents.

[3] Cooper testified that he based his conclusion about the parties' liquid assets at the date of marriage on account statements dated as close to the date of marriage as possible. In determining the parties' liquid assets held at the date of marriage, Cooper allocated any uncertain items to Furrh's separate property.

[4] The parties also held various joint deposit and checking accounts during their marriage.

$62,243 of his securities to initially fund the Jack White account. As confirmed during Furrh's testimony, records show over $2 million in checks being deposited from Frick's separate accounts into the Jack White account between November 1995 and February 1997.

Furrh was primarily responsible for managing the parties' finances. Furrh devoted significant attention to buying and selling securities through the Jack White account, and there were capital gains on the investments as reported on the parties' tax returns. It was not possible to directly trace every securities trade in the Jack White account to determine whether a specific gain or loss in the account was attributable to the original funding contribution of Frick or Furrh. Therefore, for the purposes of his analysis, Cooper allocated the income from the Jack White account to Frick and Furrh based on what he determined to be their ratio of initial funding: 97 percent to Frick, and 3 percent to Furrh.

B.  *Issue of Reimbursement for Separate Property Contributions to the Purchase of Real Estate in 1999*

In April 1999, the parties purchased real property at 869 San Antonio Place in San Diego (San Antonio) for $1,815,900 in cash. In September 1999, the parties purchased real property at 690 California Street in Oceanside (California St.) for $1,230,000 in cash.[5] There was no dispute at trial that both parcels were held as the parties' community property based on the form of title on the grant deeds. However, a major disputed issue during trial was whether the parties could establish that either of them contributed their

_____

5      The parties sometimes refer to California St. as "Seaview Point," presumably based on the name of the condominium development.

4

separate property funds to the purchase of the San Antonio and California St. properties for the purpose of establishing a right to reimbursement under section 2640.

      1.     *The Purchase of the San Antonio and California St. Properties Was Structured as a Reverse Like-Kind Exchange Under Section 1031 of the Internal Revenue Code*

As relevant here, Furrh attempted for tax purposes to structure the purchase of the San Antonio and California St. properties as a reverse like-kind exchange under section 1031 of the Internal Revenue Code (26 U.S.C. § 1031).

As Cooper explained, a like-kind exchange under Internal Revenue Code section 1031 "allows a taxpayer to move an investment in real property currently owned to other real property without paying tax on sale of the original property.  This provides a significant benefit to real estate investors since they can use all the proceeds from sale of the originally owned property . . . rather than the net of tax proceeds."  Cooper further explained that in a *reverse* Internal Revenue Code section 1031 like-kind exchange, as Furrh purported to accomplish here, "the taxpayer acquires the target properties first, then at a later date, sells the relinquished properties within the time limits to meet the requirements under [Internal Revenue Code section ]1031."

According to the evidence presented at trial, to accomplish the Internal Revenue Code section 1031 reverse like-kind exchange, the funds for the purchase of the San Antonio and California St. properties in 1999 were loaned by the parties to an entity set up to accommodate the exchange, San Diego Bay, LLC (the accommodator).  According to the documentation, the accommodator then bought the San Antonio and California St. properties in 1999 from the sellers (using the loaned funds) and took title to the

5

properties. Then, in the years 2000 and 2001, Furrh and Frick sold some of their separate

real properties[6] and paid the proceeds from those real estate sales to the accommodator,

who then used the funds to repay the loan used to buy the San Antonio and California St.

properties.[7]

Furrh could not provide a detailed explanation about the movement of the funds in

the Internal Revenue Code section 1031 reverse like-kind exchange,[8] and his expert

witness, Karen Kaseno, did not attempt to do so. Wesley and Cooper both testified that

---

[6]     According to the record, the parties sold five real properties in 2000 and 2001,
which may have been part of the purported Internal Revenue Code section 1031 reverse
like-kind exchange. Specifically, Furrh sold: 109 South Horne (Sept. 9, 2000); 123
South Nevada (Sept. 11, 2000); 3704 Clove Way (Dec. 11, 2000); and 260 Diamond
Street (Jan. 21, 2001). Frick sold 330 South Horne Street (Aug. 31, 2000).

[7]     The second half of the Internal Revenue Code section 1031 reverse like-kind
exchange transaction was not well explained or well documented at trial. The most
useful explanation of the Internal Revenue Code section 1031 reverse like-kind exchange
transaction — although still very sparse and not supported by documentation — came
from the testimony of Frick's expert witness, Robert F. Wesley, who cautioned that he
was not an expert on Internal Revenue Code section 1031 exchanges. As Wesley
explained, "The money . . . on a theoretical basis was supposed to be from [Frick] and
[Furrh], [who] len[t] it to an accommodator who was supposed to purchase [San Antonio
and California St.] And then somewhere down the line to complete the 1031 exchange,
109 [South ]Horne, 123 South Nevada, 3704 Clove, and 26[0] Diamond as well as 330
South Horne would then have been sold. The money was supposed to go back to the
accommodator, and then the accommodator would have repaid the loan back to the
parties." As the transaction was apparently set up, only after the money from the sale of
the couple's real estate was turned over to the accommodator, and those funds were in
turn used to reimburse Frick and Furrh for the original loan made to the accommodator
did title to San Antonio and California St. pass from San Diego Bay, LLC to Frick and
Furrh by recorded quit claim deeds.

[8]     As Furrh simplistically testified, "the money was all sifted through and given to
the correct person."

Internal Revenue Code section 1031 was not relevant to tracing the separate property funds contributed by Frick or Furrh to the purchase of the San Antonio and California St. properties because it was undisputed that those funds originally came from Frick and Furrh's accounts in 1999, and the federal tax provision was meant to provide favorable tax advantages, not to impact a tracing analysis under the Family Code.

2.      *Wesley's Tracing Analysis*

To determine whether separate property was used to purchase the San Antonio or California St. properties for the purpose of the section 2640 reimbursement claim, Frick's expert Wesley undertook an analysis of the parties' available separate property liquid assets at the time of the real property purchases in 1999 as well as any available community property liquid assets. As the starting point of his analysis, Wesley relied on Cooper's conclusions about the liquid assets available to the parties at the date of marriage (which, as we have described above, Cooper concluded to be $2,888,178 for Frick, and $227,689 for Furrh), as well as the amount of separate property income and community property income earned by the parties from the date of marriage to the time that the San Antonio and California St. properties were purchased in 1999.

As Wesley's analysis relied on Cooper's calculation of the parties' income between 1996 and 1999, we first turn to those figures. Based on the parties' tax returns, account statements and other supporting documentation, Cooper concluded that the community property income from the date of marriage to April 1999 when the San Antonio property was purchased was $81,036, and the community property income between April 1999 and the purchase of the California St. property in September 1999 was $14,450.

7

Community property income was minimal because Frick and Furrh were retired and did not have community property assets that were generating income.[9]

Frick's separate property income from the date of marriage to April 1999 was $1,104,962, and her separate property income from April 1999 to September 1999 was $269,286. The primary sources of Frick's separate property income were the capital gains on her investments, including those held in the Jack White account,[10] and the income on her separate property rental properties.

Furrh's separate property income from the date of marriage to April 1999 was $16,168, and his separate property income from April 1999 to September 1999 was $33,160. Furrh's sources of separate property income included the capital gains on his separate property investments held in the Jack White account and the income from his separate property rental properties. However, as reflected on the parties' tax returns, Furrh's rental properties were not particularly profitable due to associated expenses. For instance, the tax returns for one year showed a net loss of $44,575 on Furrh's rental properties.

In the next step of his analysis, Wesley factored in the parties' living expenses from the date of marriage until the purchase of the San Antonio and California St. properties in 1999. There was no dispute at trial that insufficient records existed to create

---

[9]    Cooper testified that when he was uncertain how to characterize an item of income that appeared on the tax returns, he designated it as community property.

[10]    As we have explained, Cooper assigned 97 percent of the capital gains in the Jack White account to Frick, and 3 percent of the capital gains in that account to Furrh.

a detailed accounting of the parties' living expenses. However, Frick created a list of the parties' estimated annual living expenses, as well as one-time significant expenses, such as trips and vehicle purchases, all of which she described at trial.

According to Frick's estimate, the parties' annual living expenses, excluding travel expenses and one-time significant expenses, averaged $107,600 per year between 1996 and 1999. With the travel expenses and one-time large expenditures included, the annual expenses from 1995 to 1999 averaged $148,123.[11] Furrh testified that he had no dispute with Frick's estimate of their annual living expenses.

With respect to expenses, Wesley also pointed out that Furrh had used his separate property funds to pay off the mortgages on two of his separate property real properties in 1998: $50,676.94 for the Valley Road property, and $42,262 for the Clove Way property.[12]

---

[11] As reflected in Wesley's report, prior to trial, Frick had estimated the parties' annual living expenses, excluding one-time big items and significant travel expenses to be least $98,000 per year, and Wesley used that figure in preparing his report. In its statement of decision, the trial court also referenced the amount of $98,000 per year in living expenses. The difference between $98,000 and $107,600 is not material to our analysis.

[12] We note that the statement of decision states that $43,345 was the amount paid on the principal on the Clove Way property. It is unclear where that figure is derived from, although it also appears in Frick's closing argument. Further, Wesley several times refers to a rough amount of $91,000 that Furrh paid to reduce the principal on the two mortgages, although the total shown on the records is actually $92,939. The discrepancy is not relevant because, regardless of the precise figure, the reasoning of the trial court as reflected in the statement of decision would still show that Furrh had no available separate property funds with which to purchase the San Antonio property in April 1999.

In the last step of his analysis, Wesley subtracted the parties' living expenses from their available community property and separate property funds to determine that (1) no leftover community property funds were available to apply to the purchase of either the San Antonio or California St. property; and (2) based on Furrh's relatively small amount of separate property funds, Furrh could not have contributed a significant amount of his own separate property funds to purchase the San Antonio or California St. property, with Frick's separate property funds necessarily making up the majority of the funding source for those purchases.

3. *The Trial Court's Statement of Decision on Section 2640 Reimbursement for the Purchase of the San Antonio and California St. Properties*

In its statement of decision, the trial court adopted Wesley's basic tracing methodology and arrived at the following specific findings as to the parties' separate property contributions to the purchase of the San Antonio and California St. properties.

First, fixing the parties' total minimum living expenses from the date of marriage to the acquisition of the San Antonio property at $443,000 based on the parties' testimony, the trial court reasoned that all of the community property income would have been consumed in that period by the parties' community living expenses.[13] Thus, no community property funds could have been used to buy the San Antonio property in April 1999.

---

[13] Specifically, the trial court assumed $98,000 in annual living expenses, plus $100,000 in extraordinary expenses for travel and vehicle purchases.

Second, even after assuming that *all* of the community property income in the period from September 1999 to April 1999 was paid out to cover the community living expenses, significant community living expenses remained, totaling $359,834. The trial court found that those expenses were necessarily paid with the parties' separate property funds. The trial court charged each party's separate property funds for half of the leftover community living expenses, in the amount of $179,917 each.[14] The trial court then examined whether, through a process of elimination, it could determine which funds were necessarily used to purchase the San Antonio and California St. properties.

In conducting this analysis, the trial court relied on Cooper's calculations of Furrh's beginning balance of liquid assets at the date of marriage, Furrh's separate property income since the date of marriage, and Furrh's expense of paying off two mortgages in 1998, to determine that in April 1999, Furrh had at most $149,835 in separate property funds. The trial court concluded that the entire amount of $149,835 would have been consumed by Furrh's share of the leftover community living expenses of $179,917. As a result, the trial court ruled that Furrh could not have contributed any separate property funds to the purchase of the San Antonio property in April 1999, and

_____

[14]    In the statement of decision, the trial court observed that it "appears to be a matter of first impression . . . how to apportion the $359,834 of expenses between the parties' separate property funds." The trial court concluded that it was a "fair method" to require the parties to pay the expenses equally. Although the trial court identified the matter as an apparent issue of first impression, the parties do not challenge that part of the trial court's ruling on appeal, and we accordingly do not express a view on the issue.

11

therefore the entire purchase price of the San Antonio property was paid with $1,818,626.48 of Frick's separate property funds.

The trial court applied the same approach in determining the source of funds used to purchase the California St. property in September 1999. Based on Cooper's calculations, the community earned $14,450 in income between the April 1999 purchase of the San Antonio property and the September 1999 purchase of the California St. property, and Furrh earned $33,160 in separate property income. The entire amount of the community property income would have been consumed by the parties' community living expenses during that period.[15] The remaining community living expenses during the period from April to September 1999 would have been $26,384. Charging Furrh's separate property funds with half of those expenses, Furrh had $19,968 of separate property funds to contribute to the purchase of the California St. property in September 1999. The balance of the purchase price was $1,200,982, which the trial court concluded was paid with Frick's separate property funds.

In sum, as to the section 2640 reimbursement issues for the purchase of the San Antonio and California St. properties, the trial court found that Frick was entitled to reimbursement from the community of $1,818,626.48 for separate property contributions to the purchase of the San Antonio property and $1,200,982 for separate property contributions to the purchase of the California St. property; and Furrh was entitled to

_____

[15] Although not explicitly setting forth its calculations, the trial court appears to have assumed five months of living expenses between the purchase of the San Antonio and California St. properties at a rate of $98,000 per year.

12

reimbursement from the community of $19,968 for separate property contributions to the purchase of the California St. property.

C.      *Reimbursement for Separate Funds in the Parties' Financial Accounts at Date of Separation*

Another issue decided at trial was whether the parties were entitled to reimbursement for any separate property funds that they could trace to the parties' joint financial accounts at the date of separation. Among the funds the parties were attempting to trace were the proceeds from the sale of certain separate property real estate. Specifically, Furrh sold seven real properties between September 2000 and September 2004.[16] Frick sold one real property in August 2000.[17]

In analyzing this issue, the trial court explained that the evidence was not sufficient to conduct a tracing of all of the parties' separate property funds after the purchase of the San Antonio and California St. properties. Although Furrh's expert, Kaseno, attempted to conduct a tracing of certain of Furrh's separate property funds

---

[16]    According to Wesley's report, Furrh's seven real estate sales between 2000 and 2004 were the (1) sale of 109 South Horne on September 9, 2000, for $361,552; (2) sale of 123 South Nevada on September 11, 2000, for $545,793; (3) sale of 3704 Clove Way on December 11, 2000, for proceeds of $119,796; (4) sale of 260 Diamond Street on January 21, 2001, for proceeds of $835,620; (5) sale of 2133 Valley Road on May 23, 2003, for proceeds of $428,525; (6) sale of 4267 Arcata Bay Way on March 29, 2004, for proceeds of $226,102; and (7) sale of 1302 Partridge Lane on September 14, 2004, for proceeds of $377,676. As we have explained, the sale of the properties in 2000 and 2001 may have been included in the Internal Revenue Code section 1031 reverse like-kind exchange.

[17]    According to Wesley, Frick sold 330 South Horne Street in August 2000 for proceeds of $1,068,416.

13

obtained from the sale of his real estate into the parties' financial accounts at the date of separation, the trial court stated that it found Kaseno's report to be "flawed and inaccurate" and decided to "disregard Ms. Kaseno's report in its entirety."

However, the trial court also found that (1) Furrh had adequately traced $1,603,149 from his real estate sales to a TD Waterhouse account, which was formerly the Jack White account; (2) Frick had traced $900,000 from her real estate sales to that same account; and (3) Frick had also established she had a preexisting balance of $836,649 in separate property funds in that account as of July 2000.  The trial court's statement of decision does not specify the dates of the parties' deposits to the TD Waterhouse accounts.  However, based on our review of the record, it appears that the trial court was relying on page 16 of Wesley's report in making the finding that the parties had traced funds to a TD Waterhouse account, which was formerly the Jack White account.  According to that report, the deposits to the TD Waterhouse account that the parties had traced were as of 2000 and 2001, several years prior to the date of separation.[18]  The trial court noted that these figures resulted in an approximately *equal*

_____

[18]     Specifically, Wesley states that as of July 31, 2001:  (1) Furrh had deposited $1,603,149 into the TD Waterhouse account, consisting of proceeds from the sales of his separate property real property in 2000 and 2001; (2) Frick had deposited $900,000 into the TD Waterhouse account, consisting of proceeds from her sale of 330 South Horne Street; and (3) Frick had a preexisting balance of $836,649.21 in separate property funds in the TD Waterhouse account.  Therefore, in finding that the parties had *traced* relatively equal amounts into the TD Waterhouse account, the trial court was indicating that the parties had traced those amounts only to deposits *in 2000 and 2001*, not to any account balances at the date of separation *in 2007*.

14

amount of separate property traced by each party as having been deposited in the TD Waterhouse account.

Noting both that (1) it was impossible to trace the party's separate property funds after the purchase of the San Antonio and California St. properties; and (2) the limited amounts the parties had shown that they deposited in the TD Waterhouse account were approximately *equal*, the trial court concluded neither party had established a right to reimbursement from the parties' financial accounts at the date of separation.

D.      *Borrego Springs Real Property*

Another disputed issue at trial was whether Furrh was entitled to reimbursement for separate property funds that he contributed before the parties' marriage toward the 1994 purchase of a vacation home in Borrego Springs by Frick's parents (the Borrego Springs property).

According to Furrh, the sellers of the Borrego Springs property agreed to a sale price of $250,000, but Frick's parents wanted to pay only $200,000 for a vacation home. Furrh testified that he personally contributed an additional $50,000 in cash directly to the sellers to meet their stated requirement for a $250,000 sale price. According to the escrow documents, the sale was completed at the price of $200,000, with the additional $50,000 not documented.

Furrh testified that he had no discussion with Frick's parents about giving him a legal interest in the Borrego Springs property for his $50,000 contribution, and there were no recorded documents giving him any ownership interest. Instead, as Furrh testified, "I just thought we were buying something for the family, and I didn't mind helping." At the

15

time of the purchase in 1994, Frick and Furrh had no plans to get married but were living together.

Frick's parents both passed away in 1995, shortly before the parties' September 1995 marriage, and Frick inherited the Borrego Springs property. Title was transferred to Frick as her separate property in December 1995, with Furrh handling the recording of the deed as the executor of the estate.

As part of the dissolution proceedings, Furrh contended that he was entitled to reimbursement in the amount of $50,000 for the separate property funds he contributed to purchase the Borrego Springs property in 1994. The trial court ruled in favor of Furrh, concluding that pursuant to section 2640, Furrh was entitled to reimbursement from Frick in the amount of $50,000.

E.     *Breach of Fiduciary Duty*

During his testimony, Furrh confirmed that he was involved in making deposits from Frick's separate property accounts between 1995 and 1997 to the jointly-held Jack White account in a total amount of over $2 million. Furrh also testified that he assumed the parties' joint accounts were community property. Frick contended that these facts showed that Furrh breached a fiduciary duty to her as the manager of her separate property funds. The parties could not agree at trial whether the breach of fiduciary duty issue was properly before the trial court as part of the stipulated reserved issues. The trial court ruled during trial that the issue of breach of fiduciary duty under section 721 was properly before it, but only as part of the reserved section 2640 reimbursement claim.

16

In its statement of decision, the trial court found that Furrh had breached a fiduciary duty to Frick in violation of section 721. Specifically, the trial court pointed out that Furrh testified that "the legal effect of transferring [Frick's] separate property funds to a community property fund would result in [Frick's] funds all becoming community property." The trial court explained that "[w]hile this is not the law, and while his transfers did not result in [Frick] losing any money, it's troubling to the court that [Furrh] hoped to in effect transmute [Frick's] separate property to the parties' community property, thereby providing him with what he hoped would be a windfall."

Although the trial court found that Furrh's behavior constituted a breach of fiduciary duty, it did not impose any penalty as Frick did not lose any money and had been able to trace her separate property contributions to the purchase of the San Antonio and California St. properties without relying on her argument that Furrh breached a fiduciary duty in managing her separate property funds.

F.      *Issues on Appeal*

Furrh has appealed from (1) the trial court's ruling that Frick is entitled to reimbursement for her separate property contributions to the purchase of the San Antonio and California St. properties; (2) the trial court's ruling that the funds in the parties' joint financial accounts at the date of separation should be split equally, with neither party entitled to reimbursement; (3) the trial court's purported failure to rule on whether Furrh is entitled to reimbursement for the funds obtained from the sale of his real property in 2003 and 2004; and (4) the trial court's ruling that Furrh breached a fiduciary duty to Frick in violation of section 721.

17

Frick has cross-appealed from the trial court's ruling that Furrh is entitled to reimbursement from Frick in the amount of $50,000 for his contribution to the purchase of the Borrego Springs property prior to the parties' marriage.

II.

FURRH'S APPEAL

A. *Furrh's Appeal from the Ruling That Frick Is Entitled to Reimbursement for Separate Property Contributions to the Purchase of the San Antonio and California St. Properties*

We first consider Furrh's contention that the trial court erred in finding that Frick was entitled to reimbursement pursuant to section 2640 because she adequately established that she made a separate property contribution of $1,818,626.48 to the purchase of the San Antonio property and a separate property contribution of $1,200,982 to the purchase of the California St. property.

1. *Applicable Legal Principles*

We begin with an overview of the applicable legal principles for obtaining reimbursement of separate property funds used to purchase a community property asset. Section 2640, subdivision (b) provides: "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and may not exceed the net value of the property at the time of the division." (See *In re*

18

*Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057 (*Cochran*) ["Though tracing to a separate property source generally cannot defeat title presumptions, . . . it will establish a prima facie statutory right of reimbursement in a marital action dividing the community estate." (Fn. omitted.)].) As the statute expressly states, only an express written waiver will defeat a party's right to seek reimbursement for separate property contributions to a community property asset pursuant to section 2640. (*Id.*, subd. (b); *In re Marriage of Carpenter* (2002) 100 Cal.App.4th 424, 427 (*Carpenter*).)

"Whether the spouse claiming a separate property interest has adequately traced an asset to a separate property source is a question of fact for the trial court, and its finding must be upheld if supported by substantial evidence." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823 (*Braud*).)[19]

When a party purchases a community property asset using separate property funds that have been comingled with other funds in a joint account, that party may obtain reimbursement "where the separate property contribution is traced to its source." (*Carpenter*, *supra*, 100 Cal.App.4th at p. 427.) Here, as we have explained, after the parties married, the majority of Frick's separate property funds were comingled in the Jack White account, which also contained Furrh's separate property funds. The parties also had certain community property income during the relevant time period. It was

---

[19]     However, when our review of the trial court's decision concerns " 'legal principles and their underlying values, the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law.' " (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734 (*Rossin*).)

therefore Frick's burden to trace her separate property funds to show that those funds were used to purchase the San Antonio and California St. properties, rather than Furrh's separate property funds or the parties' community property income.

Case law discusses two different methods for tracing a separate property contribution into the purchase of a community property asset for the purpose of obtaining reimbursement under section 2640. "It is hornbook California family law that tracing is done either directly, or by a process of elimination whereby a spouse shows the exhaustion of available community funds at the time of acquisition." (*In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841 (*Stoll*).)[20]

The first method is referred to as direct tracing. "Under the 'direct tracing' method, the disputed asset . . . is traced to the withdrawal of separate property funds from the

---

[20]    Section 2640 and its predecessor statute, former Civil Code section 4800.2, enacted in 1983, established that a party had the right to reimbursement for the contribution of separate property to a community property asset. (*Cochran*, *supra*, 87 Cal.App.4th at p. 1061; *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 914.) Prior to that time, courts discussed the two distinct methods of tracing — i.e., direct tracing and family living expense tracing — in the context of deciding whether a party adequately established that separate property was used to fund the purchase of an asset during marriage for the purpose of *characterizing* that asset as the party's separate property rather than community property. Thus, prior cases discussing family living expense tracing and direct tracing arose in the legal context of property *characterization* rather than *reimbursement*. (*See v. See* (1966) 64 Cal.2d 778, 783 (*See*); *In re Marriage of Mix* (1975) 14 Cal.3d 604, 612 (*Mix*); *Estate of Murphy* (1976) 15 Cal.3d 907, 918; *Hicks v. Hicks* (1962) 211 Cal.App.2d 144, 157.) However, those same tracing methodologies are now employed in cases where tracing is conducted to obtain reimbursement under section 2640. (*Walrath*, at p. 920, fn. 5; *Braud*, *supra*, 45 Cal.App.4th at pp. 823-824; *Cochran*, at pp. 1058-1059; *Stoll*, *supra*, 63 Cal.App.4th at p. 841.) We cite to cases conducting tracing under both characterization and reimbursement scenarios, as the methods employed are the same in both instances.

commingled account. This method requires *specific records* reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. Separate property status cannot be established by mere oral testimony of intent or by records that simply total up all separate property funds available during the relevant period and all the separate expenditures during that period; such records do not adequately trace to the source of the purchase at the time it was made." (*Braud*, *supra*, 45 Cal.App.4th at p. 823.) In one case, for instance, direct tracing was accomplished when the party presented a schedule of receipts and expenditures showing the availability of separate funds on given dates and also testified that the schedule accurately reflected the receipts and expenditures as accomplished through various bank accounts. (*Mix*, *supra*, 14 Cal.3d at p. 613.) In contrast, in *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 444-445, the court held that the party's attempt to conduct a direct tracing of stock purchases was unsuccessful. "Since the records introduced by husband were prepared after the stock transactions took place and the work sheet did not correlate each stock transaction with an entry in a particular bank account and it is close to impossible to trace the source of most of the shares of stock because husband indiscriminately deposited and withdrew funds from his bank accounts for his stock transactions, the trial court did not err in determining that all of the stock purchased by husband during the marriage was community property on the ground that it could not determine which stocks were purchased from funds in the Great Western account." (*Ibid.*) Here, Frick did not attempt to use the direct tracing method, as account records were incomplete.

21

The second method of tracing is referred to as the family living expense method and does not require the existence of detailed account records showing each transaction in the parties' financial accounts. "Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. . . . Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds. . . . The recapitulation must be sufficiently exhaustive to establish not only that separate property funds were available to make the payments, but that they were actually used. . . . [T]he record must demonstrate that community income was depleted at the time the particular asset was acquired." (*Braud*, *supra*, 45 Cal.App.4th at pp. 823-824, citations omitted.) "If at the time of the acquisition of the property in dispute, it can be shown that all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds." (*Mix*, *supra*, 14 Cal.3d at p. 612.) "Basically . . . the rule effectuates a tracing of the source of the disputed property by a process of elimination." (*Patterson v. Patterson* (1966) 242 Cal.App.2d 333, 344 (*Patterson*).)

Following the lead of Frick's expert witnesses, the trial court's statement of decision made findings under the family living expense method to conclude that Frick had traced her contribution of separate property funds to the purchase of the San Antonio and California St. properties. Put simply, the trial court found that Frick had eliminated

22

all of the other possible sources of payment for the purchase of the San Antonio and California St. properties,[21] and therefore concluded that Frick contributed her separate property funds to the purchases.

2.    *Furrh's Arguments*

Furrh sets forth a variety of arguments attacking the trial court's decision that Frick was entitled to reimbursement under section 2640 for the contribution of funds to the purchase of the San Antonio and California St. properties.

Although Furrh's arguments are poorly developed, often lack necessary citations to the record and to legal authority, and frequently are difficult to follow, we have endeavored to sort out Furrh's arguments and have grouped them into three categories: (1) Furrh's challenges to how the tracing methodology was carried out; (2) Furrh's contentions that the underlying findings on factual issues for the tracing analysis were flawed, such as the trial court's findings about the parties' respective separate property funds, community property income, and the amount of the family living expenses; and (3) Furrh's contention that the trial court erred in not assigning any significance to the Internal Revenue Code section 1031 reverse like-kind exchange in determining whether

---

[21]    As we have explained, as to the purchase of the California St. property, Frick eliminated all other sources of funds *except* for $19,968 of Furrh's separate property funds, for which Furrh was entitled to reimbursement.  As to the purchase of the San Antonio property, Frick eliminated *all* other possible sources of funds.

Frick successfully traced her separate property funds to the purchase of the San Antonio and California St. properties. We now turn to each category of argument.[22]

a. *Flaws in Applying the Tracing Methodology*

We first consider Furrh's arguments directed at establishing that Frick's attempt to trace her separate property contributions to the purchase of the San Antonio and California St. properties was not properly carried out and thus should not have been accepted by the trial court. Specifically, we address Furrh's arguments that (1) Frick was required to meet the standards applicable to a direct tracing, but did not do so; and (2) even if a family living expense tracing methodology was available to Frick, she failed to satisfy a basic requirement for that type of tracing because she did not establish that her separate property funds were *actually used* to purchase the San Antonio and California St. properties.

---

[22] As a preliminary observation, we note that Furrh's briefing places significant emphasis on the applicability of section 760, which creates a presumption that property acquired during the marriage is community property. At certain points in his briefing, Furrh discusses the community property presumption of section 760 in a context that implies he believes the characterization of the San Antonio and California St. properties as community property or separate property is at issue in this appeal. However, Furrh's discussion is misplaced. Frick did not dispute at trial that the San Antonio and California St. properties were the parties' community property, and the trial court expressly concluded that because those parcels were acquired during marriage (§ 760) and held in joint form (§ 2581), they were community property. Further, despite Furrh's apparently mistaken understanding to the contrary, all of the *appreciation* on the value of the community property assets — San Antonio and California St. — was awarded to the community. The sole disputed issue with respect to the San Antonio and California St. properties at trial and on appeal is whether Frick is entitled to *reimbursement* under section 2640 for her separate property funds used to acquire those properties for the community.

24

i.      *Direct Tracing Instead of Family Living Expense Tracing*

As we have explained, there are two distinct tracing methodologies on which a party may rely to trace separate property contributions to the acquisition of a community property asset:  direct tracing and family living expense tracing.  Further, as we have explained, Frick's experts did not attempt to conduct a direct tracing because the records were not available to do so.  Instead, Frick's experts used the family living expense methodology, employing a process of elimination to establish that Frick's separate property funds were necessarily used to purchase the San Antonio and California St. properties.  The trial court relied on the evidentiary presentation and analysis by Frick's experts' under the family living expense method and found that Frick successfully traced her separate property contributions to the purchase of the San Antonio and California St. properties.

Even though Frick did not attempt to conduct a direct tracing, Furrh contends throughout his briefing that Frick did not adequately trace her separate property funds because she did not satisfy the requirements applicable to a party conducting a *direct tracing*.  For example, citing portions of case law on direct tracing, Furrh argues that the burden was on Frick "to provide 'specific records reconstructing each separate and community property deposit, and each separate and community property payment as it occurs.' "  (Quoting *Braud*, *supra*, 45 Cal.App.4th at p. 823.)[23]  Although he does not

_____

[23]    This quotation is clearly from the portion of *Braud* discussing the requirements for *direct tracing*.  Quoted more fully, *Braud* states, "Under the 'direct tracing' method, the disputed asset (in this case the improvements to the community property home) is traced

25

directly say so, Furrh apparently believes that, under the circumstances, Frick was required to conduct a *direct tracing*, and that the family living expense method was therefore not available to her to trace her separate property contributions to the purchase of the San Antonio and California St. properties.  Furrh's argument fails.

Case law consistently states that *two* tracing methods are available when separate property funds are comingled with other funds and a party is seeking to establish under section 2640 that a payment was made with separate property funds.  (*In re Marriage of Margulis* (2011) 198 Cal.App.4th 1252, 1281-1282 ["a spouse who has commingled community and separate funds" can employ "traditional family law tracing methods, such as direct tracing or the family expense method of tracing"]; *Braud*, *supra*, 45 Cal.App.4th at p. 822 ["Either of two tracing methods may be utilized . . . :  'direct tracing,' or 'family living expense tracing.' "]; *Stoll*, *supra*, 63 Cal.App.4th at p. 841 ["It is hornbook California family law that tracing is done either directly, or by a process of elimination . . . ."].)  Thus, although Furrh cites to the standards for *direct* tracing in arguing that Frick did not successfully trace her contributions to the purchase of the San Antonio and California St. properties, Frick was entitled to reject use of the direct tracing

---

to the withdrawal of separate property funds from the commingled account.  This method requires *specific records* reconstructing each separate and community property deposit, and each separate and community property payment as it occurs." (*Braud*, *supra*, 45 Cal.App.4th at p. 823.)  In the next paragraph, *Braud* contrasts the family living expense method, in which "it is assumed that family living expenses are paid out of community property funds" and "[p]ayments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds." (*Ibid*.)

26

method and instead rely on the family living expense method of tracing, which does not have the same documentation requirements.

As part of his discussion of direct tracing, Furrh cites to *See*, *supra*, 64 Cal.2d 778, for the statement that a spouse who allows the commingling of community and separate assets and income "assumes the burden of keeping *records adequate to establish* the balance of community income and expenditures at the time an asset is acquired with comingled property." (*Id*. at p. 784, italics added.) If Furrh interprets *See*'s reference to adequate "records" to mean that a party who comingles funds is limited to *direct tracing*, he is mistaken. After *See* was decided, our Supreme Court made clear in *Beam v. Bank of America* (1971) 6 Cal.3d 12 (*Beam*) that by its discussion in *See* it "intended to work *no* changes in the established family expense presumption." (*Beam*, at p. 23, italics added.) As *Beam* explained, even if a party knowingly comingles funds, the party may establish that the account contained separate property used to purchase an asset if he or she introduces sufficient evidence to conduct a family living expense tracing and, through that method, show that family living expenses exceeded community income at the relevant time. (*Ibid*.) Thus, the fact that Frick's funds were comingled with other funds in the Jack White account does not preclude her from using a family living expense tracing methodology rather than a direct tracing methodology to establish the source of funds used to purchase the San Antonio and California St. properties. (See *Cochran*, *supra*, 87 Cal.App.4th at pp. 1058-1059 [party successfully employed the family living expense tracing method in lieu of conducting a direct tracing to establish a separate property payment of funds when the evidence sufficiently established that separate and

27

community property funds were deposited in a comingled account, but that community property funds were exhausted at the time the funds at issue were paid out].)

Further, although Furrh's argument is not entirely clear, he appears to contend that the family living expense method of tracing was not available to Frick because she did not have sufficient documentation of the parties' living expenses to undertake such an analysis. We disagree. Case law establishes that for the purposes of tracing under the family living expense method, "[c]ommunity expenses may be shown by circumstantial evidence." (*Price v. Price* (1963) 217 Cal.App.2d 1, 8.) As the court noted in *Price*, although the husband "did not offer a formal accounting of all sums expended for the maintenance of his family during the long period of marriage," the evidence of family expenses was nevertheless sufficient because "the record is replete with evidence relating to the manner in which they lived," including the general expenses associated with their high standard of living. (*Ibid.*) Similarly, in *Beam*, *supra*, 6 Cal.3d at pages 16 and 21, the testimony of the parties concerning their normal monthly living expenses was sufficient for the purposes of applying the family living expense methodology. (*Id.* at p. 16 [observing that pursuant to "testimony of both parties, the ordinary living expenses of the family throughout the marriage amounted to $2,000 per month and, in addition, after 1960, the family incurred extraordinary expenses (for travel, weddings, gifts) of $22,000 per year"].) Here, Frick testified about the family's estimated living expenses, and Furrh expressly stated at trial that he had no dispute with Frick's testimony on that subject.

*Frick Established That Her Separate Property Funds Were Actually Used to Purchase the San Antonio and California St. Properties*

In his second challenge as to how the tracing analysis was carried out, Furrh argues that even if the family living expense method was available to Frick, she failed to satisfy a basic requirement of that tracing analysis because she failed to establish, as required by *Braud*, *supra*, 45 Cal.App.4th at pages 823-824, "not only that separate property funds were available to make the payments, but that they were actually used" "at the time the particular asset was acquired." (*Ibid*.)  As we will explain, Furrh's argument lacks merit.  Substantial evidence supports a finding that Frick's separate property funds were actually used, not just available, to purchase the San Antonio and California St. properties.

The family living expense approach to tracing relies on "a process of elimination" (*Patterson*, *supra*, 242 Cal.App.2d at p. 344) to establish that a community asset *must have been* bought with separate property funds because all other possible source of funds have been eliminated due to the community property funds having been consumed by family living expenses.  (*Mix*, *supra*, 14 Cal.3d at p. 612 [if "all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds"].)  Thus, in *Braud*, when the husband sought to establish that home improvements were paid for with his separate property funds from a comingled account, he failed to do so because he could not establish that all other funds in the account had been "depleted at the time" of the home improvement payments, and thus although the separate property funds were

29

available, he did not establish that they were "actually used." (*Braud*, *supra*, 45 Cal.App.4th at p. 824.)

Here, the trial court made findings that (1) no community property funds were available to purchase the San Antonio and California St. properties because the community property funds had been consumed by the parties' living expenses; (2) only Frick's separate funds were available to purchase the San Antonio property; and (3) only a small amount of Furrh's separate funds were later available to purchase the California St. property, leaving the remainder of the purchase price to necessarily be paid by Frick's separate property funds.[24]

As a matter of logic, these findings are sufficient to establish not only that Frick had separate property *available* for the purchase of the San Antonio and California St. properties, but that those funds were *actually used*. Specifically as to the San Antonio property, the trial court found that *no other funds were available* at the time of the purchase. Thus, by a process of elimination, Frick's separate property funds were not just available, but "*actually used*" "at the time the [San Antonio property] was acquired." (*Braud*, *supra*, 45 Cal.App.4th at p. 824, italics added.) As to the California St. property, the trial court found that Furrh had only a limited amount of separate property funds available to contribute toward the purchase, and there were no community property funds

[24]    In part II.A.2.b., *post*, we will address and reject Furrh's challenges to the trial court's more specific factual findings on which these ultimate findings are based, including the trial court's findings regarding the parties' separate property funds and community property income during the relevant time period.

30

available because they had all been consumed by the family living expenses. Accordingly, the remainder of the purchase price for the California St. property, $1,200,982, must *necessarily* have been paid with Frick's separate property funds, which were thus *actually used* for that purpose.

In sum, because Frick showed that all the other possible sources of funds had been "depleted at the time" the San Antonio and California St. properties were purchased (*Braud*, *supra*, 45 Cal.App.4th at p. 824), substantial evidence supported a finding that her separate property funds were *actually used* as required by the family living expense method of tracing, not just *available*.

b.  *Factual Findings Underlying the Ruling That Frick Traced Separate Property Funds in Specific Amounts*

We next consider several arguments in which Furrh seeks to undermine the trial court's factual findings that provide the foundation for its conclusion that Frick successfully traced her separate property contributions in specific amounts to the purchase of the San Antonio and California St. properties using the family living expense method.  More specifically, as we have explained, as a predicate to its ruling awarding Frick reimbursement for her separate property contributions, the trial court made findings about (1) the parties available separate property funds from the date of marriage to 1999, when the San Antonio and California St. properties were acquired; (2) the parties' community property income during that period; and (3) the parties' family living expenses during that period.  Each of the six arguments by Furrh that we discuss in this section are aimed at attacking one or more of those factual findings, which we will

31

uphold if they are supported by substantial evidence. (*Braud*, *supra*, 45 Cal.App.4th at p. 823.) As we will explain, Furrh has failed to establish that insufficient evidence supports the trial court's findings.

        i.        *Treating the Capital Gains on the Separate Property Contributions to the Jack White Account as Community Property*

Furrh contends that the trial court relied on a flawed opinion by Cooper to make findings about the amount of separate property income that Frick had available in the Jack White account to use for the real property purchases. Specifically, Furrh contends that Cooper improperly credited the parties with the capital gains in the Jack White account according to the percentage of their separate property contributions to that account instead of treating all of the appreciation in the account as community property. As we understand Furrh's position, he contends that because the parties' separate property funds were placed in a joint account held in both of the parties' names, the funds became community property, as did the appreciation on those community property funds. As we will explain, we disagree.

We start with the fundamental statutory principle that "[t]he rents, issues, and profits" of a party's separate property also constitute that party's separate property. (§ 770, subd. (a)(3); see *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 851 (*Dekker*) ["rents, issues and profits are community property if derived from community assets, and separate property if derived from separate assets"].) The Jack White account was originally funded with the parties' respective separate property, and thus according to

32

section 770, subdivision (a)(3), Cooper treated the appreciation on that separate property as the parties' separate property as well.

The characterization of funds in a married couple's joint accounts is controlled by Probate Code section 5305. (See Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2015) ¶ 8:383, p. 8-139.)[25] Under Probate Code section 5305, a married couple's net contribution to a joint account is presumed to be community property, but that presumption can be rebutted if the "sums on deposit that are claimed to be separate property can be traced from separate property unless it is proved that the married persons made a written agreement that expressed their clear intent that the sums be their community property." (*Id*., subd. (b)(1).) This statutory presumption and the ability to rebut it by tracing is consistent with longstanding case law which does not rely on Probate Code section 5305, but which provides that separate property funds comingled in a joint bank account have the character of separate property if their source can be traced. (*Rossin*, *supra*, 172 Cal.App.4th at p. 734 [" ' "[M]ere commingling of separate with community funds in a bank account does not destroy the character of the former if the amount thereof can be ascertained." ' "].)

Here, based on our discussion in the preceding section, we have concluded that the evidence, including the available documentation, testimony and expert opinion, was

---

25    Although Furrh assumes for the purpose of his argument that the Jack White account was held jointly by the parties, no account agreements were presented at trial. The account statements for the Jack White account contained in the record up to the date of December 1997 are addressed to "Dean Furrh & Gail K. Furrh Com Prop." After that date they are addressed to "Dean Furrh & Gail K. Furrh JT Ten."

sufficient to trace the source of the funds in the Jack White account to the parties' separate property funds using the family living expense method. Indeed, Furrh does not dispute that the Jack White account was funded with the parties' separate property. Therefore, Frick met her burden to rebut the presumption that the funds in the Jack White account were community property. As the funds retained their character as separate property, there is no basis for characterizing the appreciation on the *separate property* funds held in the Jack White account as *community property*. Profits from a party's separate property are also the party's separate property. (§ 770, subd. (a)(3).)

In connection with the dispute over whether Frick adequately traced her separate property funds, Furrh repeatedly refers to a supposed agreement of the parties that they "pool" their separate property for the benefit of the community. Furrh may be attempting to establish that, within the meaning of Probate Code section 5305, by agreeing to "pool" their separate property assets in the Jack White account, the parties entered into "a written agreement that expressed their clear intent that the sums be their community property." (Prob. Code, § 5305, subd. (b)(1).) If that is Furrh's argument, it fails.

Furrh has not pointed to any written agreement by the parties that the funds held in the Jack White account would become the parties' community property, even if the funds were able to be traced to a separate property source. Furrh has identified some statements from the Jack White account addressed to "Dean Furrh & Gail K. Furrh Com Prop" and "Dean Furrh & Gail K. Furrh JT Ten," but case law establishes that a reference on an account statement to that account being held in joint tenancy or as community property does constitute "a written agreement" that expresses the "clear intent" that the funds

34

become community property as required by Probate Code section 5305. (*Id.*, subd. (b)(1); *Estate of Petersen* (1994) 28 Cal.App.4th 1742, 1754-1755.) The main evidence that Furrh points to in support of his contention that the parties agreed to "pool" their assets is a statement that Frick made in a declaration during the early stages of the dissolution proceeding. In that declaration, in the context of providing background about the parties' financial resources, Frick stated, "We each brought significant separate property assets into the marriage, which we pooled in order to acquire a number of new assets." Frick's vague statement that the parties "pooled" their assets is not a written agreement expressing the parties clear intent, as required by Probate Code section 5305, that the funds deposited in the Jack White account would be the parties' community property.

We accordingly find no merit to Furrh's argument that the trial court erred in relying on Cooper's opinion that the appreciation on the party's separate property funds in the Jack White account was also their separate property, rather than community property, for the purposes of tracing the source of the funds used to purchase the San Antonio and California St. properties.

    ii.  *Crediting the Community with Additional Income Based on Furrh's Management of the Parties' Securities*

In an argument also aimed at challenging the trial court's findings on the amount of the parties' community property income for the purpose of the family living expense tracing, Furrh contends that even if the appreciation in the Jack White account is treated as the parties' separate property, the community should have been allocated *some* of the

35

appreciation on Frick's separate property funds as compensation for Furrh's efforts in managing the investments held in the Jack White account during the marriage. Furrh bases his argument on the principle " '[t]he community is entitled to the increase in profits attributable to community endeavor.' " (Quoting *Dekker*, *supra*, 17 Cal.App.4th at p. 851.) Under this rule, "courts must apportion profits derived from community effort to the community, and profits derived from separate capital are apportioned to separate property." (*Ibid.*; see also Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:338, p. 8-84.11 ["apportionment is required even where a spouse's efforts during marriage contribute to an increase in the *other spouse's* separate property"].)

We see no indication that Furrh made this argument in the trial court. To the contrary, Furrh's expert, Kaseno, testified that she had *not* been asked to determine any value contributed by Furrh's efforts in managing the parties' investments. Kaseno explained that normally when a spouse expends effort in managing an investment account, she would recommend that the spouse be given a management fee, but she was not asked to perform that analysis here. Further, Kaseno testified that she had done no analysis to determine whether Furrh's efforts resulted in losses or gains compared to the market average.

As Furrh did not argue at trial that the community should be reimbursed for his efforts in managing the investment in the Jack White account, he may not argue on appeal that the trial court erred in failing to make such a ruling. (*In re Marriage of Walker* (2006) 138 Cal.App.4th 1408, 1418 (*Walker*) ["As a rule, parties are precluded from urging on appeal any points that were not raised before the trial court. [Citation.]

36

To permit a party to raise a new theory is both unfair to the trial court and unjust to the opposing litigant."]; *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591-592 (*Perez*) [" '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' " "Such arguments raised for the first time on appeal are generally deemed forfeited."].)

iii. *Separate Property Income from Furrh's Rental Properties*

Furrh contends that the trial court's findings about the parties' separate and community property income was flawed because Frick's experts, on whom the trial court relied, "failed to credit either the community or [Furrh] with the income from the parties' rental units." As part of this argument, Furrh contends that the experts "omit[ted] any consideration of the rental [income] from [Furrh's] income-producing properties."

Furrh's argument depends on a clear mischaracterization of the evidence. The trial court relied on Cooper's analysis for its findings about Furrh's separate property income in the statement of decision. Cooper testified that he arrived at the figures for the parties' separate property income between 1995 and 1999 by examining the parties' tax returns and supporting documents, and that he expressly included the income from the parties' respective rental properties in determining the parties' separate property income. Cooper's schedule shows rental income credited to Furrh and Frick each year.[26] We therefore reject Furrh's argument.

---

[26] At points in his briefing, Furrh appears to take the position that some of the income from the parties' rental properties between 1995 and 1999 should have been treated as community property income rather than Furrh's and Frick's separate property

37

iv.    *Furrh's Separate Property Used to Pay the Family Living Expenses*

Furrh argues that the evidence at trial established that from 1995 to 1999, prior to the purchase of the San Antonio and California St. properties, he paid the family's living expenses from his separate property rental income.  At different points, Furrh appears to rely on this purported fact to argue either (1) there were leftover community property funds to buy the San Antonio and California St. properties because all the family expenses that purportedly consumed the community property funds were in fact paid by Furrh's separate property rental property income; or (2) Furrh actually had more separate property income from his rental properties than the tax returns reflect because he deducted the payment of the community living expenses to reduce the separate property income reported on his taxes.  As we will explain, regardless of the focus of Furrh's argument, it fails because it lacks a factual foundation.

Under a fundamental legal precept applied in the family living expense method of tracing, family living expenses are presumed to have been paid first by the available community property funds.  (*Braud*, *supra*, 45 Cal.App.4th at p. 823.)  Furrh did not present evidence at trial to rebut that presumption.  Although Furrh purports to provide citations to the record to support his contention that he paid the family living expenses

income.  Furrh does not explain his basis for taking that position, and we perceive none. The record is clear that in the period 1995 to 1999, the parties did not own any community property rental units.  Therefore, in determining the parties' income from that period, Cooper properly credited the rental property income shown on the tax returns as the separate property income of either Furrh or Frick, depending on which rental property generated the income.

38

using his separate property funds from his rental properties, the record citations he provides do not establish that fact.

In arguing that he paid the family living expenses with his separate property funds, Furrh may be referring to vague testimony at trial that at some point during the parties' marriage he became more aggressive in preparing his tax returns, charging some of the family's living expenses as expenses of his rental property business. However, it appears from the parties' testimony that this aggressive approach on the tax returns did not occur until *after* the San Antonio and California St. properties were purchased in 1999, and thus would not have any relevance here. Specifically, Furrh testified that his accountant advised him to take an aggressive tax position by writing off family living expenses as part of the expenses of his rental property business only *after* he incorporated the rental property business in 2001. Frick confirmed in her testimony that she understood that Furrh's aggressive tax position was not taken until *after* incorporation of the rental property business. Moreover, Frick testified that in making her list of family living expenses, she attempted to *omit* any expenses that Furrh wrote off on the tax returns. Cooper testified that although he understood from Furrh's deposition that some of the living expenses were written off as part of the business expenses, the amount was "pretty small."[27]

---

[27]   Further, Cooper did not identify a specific a time period when describing Furrh's practice of writing off living expenses as part of the business expense. Therefore, Cooper may have been referring to write-offs that were taken *after* Furrh incorporated the rental property business in 2001.

Based on all of the above, Furrh did not establish that he used his separate property income from his rental properties, rather than community property funds, to pay the parties' living expenses from 1995 to 1999.

v.    *Extraordinary Living Expenses*

Furrh next takes issue with the trial court's factual findings about the amount of the parties' family living expenses. Specifically, he points out that Wesley's family living expense tracing analysis did not factor in the additional extraordinary expenses identified by Frick for items such as travel and expensive vehicles when determining the funds available to purchase the San Antonio and California St. properties. Furrh's argument fails because even though *Wesley* did not take account of the parties' extraordinary living expense in his analysis, the *trial court* did not make that error. Indeed, the trial court expressly made a finding that not only did the parties have $98,000 per year in family living expenses, which was the same figure used by Wesley in his analysis, the parties also had an *additional* $100,000 in extraordinary expenses over the course of the relevant time period. Thus, whatever flaw Furrh has identified in the factual assumptions underlying Wesley's tracing analysis, it was not replicated by the trial court in its statement of decision.

vi.    *Payment of Estate Taxes on Frick's Inheritance*

In his final factual challenge, Furrh takes issue with the trial court's finding that Frick had $2,888,178 in liquid assets at the time of marriage. Specifically, Furrh contends that the figure was flawed because it did not account for the estate taxes on the portion of Frick's assets that were acquired through inheritance.

40

As the factual basis for his argument, Furrh states that there was "nearly $381,337 in estate taxes on the money [Frick] inherited." We are not able to ascertain whether that figure is correct, as Furrh does not provide accurate record citations to support his argument.[28] By failing to support his argument with proper record citations, Furrh has waived the argument. (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 928 ["party on appeal has the duty to support the arguments in the briefs by appropriate reference to the record, which includes providing exact page citations," and we "have no duty to search the record for evidence and may disregard any factual contention not supported by proper citations to the record"]; *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 [arguments not supported by adequate citations to record need not be considered on appeal].)

We note, moreover, based on our own review of the record, the evidence at trial shows that the estate taxes were paid *before* the inherited property was transferred to Frick, and Cooper was operating under that assumption when he calculated that Frick had $2.8 million in separate property liquid assets at the time of the parties' marriage. Specifically, Cooper's report states that based on his review of the documentation for the estate of Furrh's aunt and uncle, "[e]xpenses of the estate, including federal and state taxes of $115,418.00, were paid by the executor. The remainder of the estate was

---

28    We note that even if Furrh's argument had merit, it would not have any practical effect, because even reducing Frick's $2.8 million in assets by $381,337 in 1995, she would still have had ample separate property funds available in 1999 to have purchased San Antonio and California St.

disbursed to [Frick]." For the estate of Frick's parents, "[e]xpenses of the estate, including federal and state taxes of $91,191, were paid by . . . the executor. The remainder of the estate was distributed to [Frick]." Further, during his testimony, Wesley stated that he proceeded on the assumption that Frick's $2.8 million in separate property assets at the time of marriage were calculated *after* estate taxes were paid.[29]

   c.  *The Internal Revenue Code Section 1031 Reverse Like-Kind Exchange*

The last issue that Furrh raises in challenge to the trial court's ruling awarding reimbursement to Frick concerns the Internal Revenue Code section 1031 reverse like-kind exchange.

As we have explained, following Wesley and Cooper's approach, the trial court did not give any effect to the structure of the purchase transaction for the San Antonio and California St. properties under Internal Revenue Code section 1031. Specifically, the trial court focused on determining the source of the funds used to purchase the San Antonio and California St. properties *in 1999* and did not attach any significance to the fact that Furrh and Frick sold some of their real properties *in 2000 and 2001* as part of the Internal Revenue Code section 1031 reverse like-kind exchange.

---

[29] In another argument that is insufficiently focused or developed to warrant extensive discussion, Furrh contends that the trial court erred in relying on Cooper's opinion because Cooper "double count[ed]" some of Frick's assets. However, the specific testimony about Frick's assets that Furrh relies upon in his appellate argument does not lend support. Specifically, the testimony that Furrh identifies concerns Cooper's criticism of charts prepared by Kaseno; it does not relate to the foundation for Cooper's own opinions.

42

Although the argument is not well developed, Furrh contends that the trial court erred in failing to take account of the Internal Revenue Code section 1031 reverse like-kind exchange when determining which funds were used to purchase the San Antonio and California St. properties. In the most clear statement of his argument, Furrh argues that Wesley's tracing analysis, which the trial court adopted, was flawed because although "Wesley acknowledged [Furrh's] properties were used in the exchange," he "refused to acknowledge [Furrh's] properties were part of the purchase price of San Antonio and [California St.]"

Furrh's argument fails because he points to no evidence supporting a finding that any of his separate property funds from the sale of his real estate *in 2000 and 2001* "were part of the purchase price" of the San Antonio and California St. properties *in 1999*. For the purposes of this appeal, there is no dispute that the purchase of the San Antonio and California St. properties occurred in 1999, not later. Indeed, as Furrh acknowledges in his opening appellate brief, "[f]or the purposes of these proceedings, San Antonio and [California St.] were deemed acquired in April and September 1999, respectively." As a simple matter of logic, separate property funds that did not become available until 2000 and 2001 could not have been used to fund purchases that occurred in 1999.[30]

_____

[30] As we have explained, the attempt to satisfy the requirements of a reverse like-kind exchange under Internal Revenue Code section 1031 impacted the structure of the transaction in which the parties acquired the San Antonio and California St. properties because the accommodator took title to those properties in 1999 and waited until 2001, when the funds from the parties' 2000 and 2001 real estate sales were paid to the accommodator, to transfer title of the San Antonio and California St. properties to Frick and Furrh by quit claim deeds. One approach that Furrh might have taken at trial, had

In an argument also related to the significance of the Internal Revenue section 1031 reverse like-kind exchange, Furrh contends that the parties entered into an agreement that they both provided half of the funding for the purchase of San Antonio and California St. in 1999, equally sharing the financial burden. As we understand this statement, Furrh contends that in deciding to structure the purchase of the San Antonio and California St. properties as a Internal Revenue Code section 1031 reverse like-kind exchange, Frick and Furrh entered into an *agreement* to treat the San Antonio and California St. properties *as if* they were purchased in 1999 with all of the funds liquidated in the parties' 2000 and 2001 real estate sales.

We reject Furrh's attempt to establish that the parties agreed to treat Furrh's funds as having been used in the purchase of the San Antonio and California St. properties. As discussed above, the right to reimbursement under section 2640 can be waived only by an express writing. (*Id.*, subd. (b); *Carpenter*, *supra*, 100 Cal.App.4th at p. 427.) Here,

sufficient documentation been available, was to attempt to trace his separate property funds through this second portion of the Internal Revenue Code section 1031 reverse like-kind exchange to establish that some of his separate property funds were paid to the accommodator in 2001 to enable the parties to acquire *title* to the San Antonio and California St. properties in 2001. However, Furrh did not take that approach at trial and thus did not present any evidence to support it. Nor does he pursue the argument on appeal, agreeing that for the purposes of this proceeding, San Antonio and California St. properties were acquired in 1999 when the accommodator first took title to them, not in 2001. Although Furrh testified very generally that he sold his real property in 2000 and 2001 as part of the Internal Revenue Code section 1031 reverse like-kind exchange so that the parties would be able to "afford" the purchase of the San Antonio and California St. properties, neither through his own testimony nor that of his expert witness, Kaseno, did Furrh attempt to establish the flow of funds to the accommodator in the second part of the exchange transaction. Indeed, Kaseno attempted to trace funds from Furrh's 2000 and 2001 real estate sales into the parties' financial accounts at the date of separation, but not to trace those funds to any payments that Furrh made to the accommodator in 2001.

44

Furrh has not identified any express writing by the parties stating that due to the parties' decision to structure the purchase of the San Antonio and California St. properties as an Internal Revenue Code section 1031 reverse like-kind exchange, Frick agreed to waive her right to trace her contribution of separate property funds to the purchase of those properties in 1999 to obtain reimbursement under section 2640.

In sum, having rejected all of Furrh's legal and factual challenges to the trial court's ruling that Frick established she was entitled to reimbursement for her separate property contributions to the San Antonio and California St. properties, we affirm the trial court's ruling awarding reimbursement to Frick under section 2640.

B.  *Tracing of Furrh's Separate Property Funds to the Parties' Financial Accounts at the Date of Separation*

We now turn to another major issue at trial that Furrh focuses on in his appellate briefing.  Specifically, the statement of decision contains a ruling on whether Furrh successfully traced any of his separate property funds obtained from the sale of his real properties into the parties' financial accounts on the date of separation for the purpose of obtaining reimbursement.  As the statement of decision explained, Furrh failed to adequately trace any separate property funds, and thus the amounts in the parties' joint financial accounts were to be split equally by the parties.

Furrh makes two arguments challenging this ruling:  (1) the trial court's findings do not support its ruling because of a purported mathematical error; and (2) the trial court failed to rule on Furrh's claim that he had adequately traced his separate property funds from the sale of his real estate in 2003 and 2004.  We will examine each of these

45

arguments in turn. However, to address the arguments, we must first take a closer look at the findings and legal conclusions underlying the trial court's ruling that the amount in the financial accounts on the date of separation should be split equally.

1.      *The Trial Court's Ruling*

The trial court made two separate findings regarding the tracing of the amounts in the parties' financial accounts.

First, apparently relying on Wesley's report about the funds in the parties' TD Waterhouse account[31] as of July 31, 2001, the trial court found that Furrh had deposited $1,603,149 into the account after his 2000 and 2001 real estate sales, and Frick had deposited $900,000 after the sale of 330 South Horne Street in 2000. Further, Frick already had a preexisting balance of $836,649 in separate property funds in the TD Waterhouse account as of July 2000. The trial court thus found that the parties' separate property funds in the TD Waterhouse account, apparently as of 2001, were "relatively equal."

Second, in addressing Furrh's attempt to trace his separate property to the financial accounts at the date of separation, the trial court found that "the court is unable to ascertain from the evidence presented whose separate property money went where after the purchase of San Antonio and California St." in 1999. Indeed, the only evidence that Furrh presented at trial in an attempt to trace some of his separate property funds to the parties' financial accounts on the date of separation was Kaseno's analysis. However, the

---

31      The TD Waterhouse account was formerly the Jack White account.

46

trial court ruled that "significant portions of [Kaseno's] work appear flawed and inaccurate," and therefore "[t]he court has elected to disregard Ms. Kaseno's report in its entirety."[32] Without Kaseno's report, there was no evidence supporting Furrh's attempt to trace his separate property funds into the financial accounts at the date of separation. Further, as the trial court observed, it was impossible to trace the separate property funds in brokerage accounts because of "fluctuations of value due to market conditions."

The trial court's second finding (that it could not trace the parties' separate property funds after 1999) provides legally sufficient support for its ruling that the amounts in the parties' financial accounts at the date of separation were to be equally divided. Comingled funds in joint accounts during marriage are characterized as community property *unless* they can be specifically traced to separate property. (Prob. Code, § 5305; *Rossin*, *supra*, 172 Cal.App.4th at pp. 733-734.) As Furrh did not succeed in tracing any of his separate property into the accounts as of the date of separation, the funds in the parties' joint accounts at the date of separation were properly treated as community property and divided equally between the parties.

2.      *The Trial's Court's Purported Mathematical Error*

In his first argument challenging the trial court's ruling that the funds in the parties' financial accounts at the date of separation should be equally divided, Furrh contends that the trial court incorrectly calculated that the parties' separate property funds in the TD

_____

[32]      In his appellate briefing, Furrh makes no argument challenging the trial court's finding that Kaseno's analysis was not credible.

47

Waterhouse account in 2001 were "relatively equal." Specifically, Furrh argues that if, as the trial court found, he deposited $1,603,149 into the account after his 2000 and 2001 real estate sales, and Frick deposited $900,000 after the sale of 330 South Horne Street in 2000, those amounts are *not* relatively equal. We reject this argument because, in performing his calculations, Furrh overlooks the trial court's finding that Frick had $836,649 of separate property funds already being held in the TD Waterhouse accounts. When the amount of $836,649 is added to the equation, the separate property funds of the parties in the TD Waterhouse account are relatively equal, with $1,736,649 attributed to Frick and $1,603,149 attributed to Furrh.

Further, even had Furrh been able to establish that the parties' separate property funds in the TD Waterhouse account were *not* relatively equal as of 2001, that fact would not undermine the trial court's decision to equally split the amounts in the parties' financial accounts at the date of separation. The trial court equally divided the parties' financial accounts at the date of separation based on the finding that Furrh had not adequately traced his separate property funds after 1999, *not* based on its finding that the parties had relatively equal separate property balances in the TD Waterhouse account as of 2001. Thus, an attack on the trial court's findings regarding the separate property balances in the TD Waterhouse account in 2001 is of no legal consequence in undermining the trial court's ruling.

3.      *Separate Property Funds from Furrh's 2003 and 2004 Real Estate Sales*

In his second challenge to the trial court's ruling on his claim for reimbursement of his separate property funds in the parties' financial accounts at the date of separation,

Furrh argues that the trial court failed to rule on his claim for reimbursement for the proceeds of his real estate sales in 2003 and 2004.[33] Furrh's argument lacks merit.

Furrh's claim for reimbursement for proceeds from the 2003 and 2004 real estate sales was covered by the trial court's ruling on the division of the funds in the parties' accounts at the date of separation. Furrh's expert Kaseno attempted to trace the funds that Furrh obtained from 2000 and 2001 real estate sales, as well as from the 2003 and 2004 real estate sales into the parties' financial accounts at the date of separation. By rejecting Kaseno's analysis in its entirety, and stating that it was not possible to trace the parties' separate property funds after 1999, the trial court ruled on and rejected Furrh's claim for reimbursement of the separate property funds from *all* of his real estate sales, including the sales in 2003 and 2004.[34]

---

[33] The parties' list of stipulated reserved issues specifically includes Furrh's "claim for proceeds from real property sold in 2003-2004 (Partridge, Valley and Arcata Bay)."

[34] Although the issue was not addressed in the trial court's statement of decision and was not within the scope of the parties' stipulated reserved issues, Furrh contends on appeal that the community should be reimbursed for $450,000 to $600,000 in taxes that were purportedly paid from community funds from 1995 to 1999 for the capital gains incurred as a result of profits made from sale of parties' separate property securities. We reject this argument for two reasons. First, Furrh has not cited to any place in the record where he made this argument during trial and has not attempted to show that this claim for reimbursement to the community is even within the scope of the stipulated reserved issues. (*Perez*, *supra*, 169 Cal.App.4th at pp. 591-592 [party forfeits argument raised for first time on appeal].) Second, even were the issue properly before us, Furrh has not cited evidence in the record to establish that community funds were used to pay the parties' capital gains taxes derived from their separate property securities. The record citations that Furrh provides in his appellate briefing do not lend support to his argument. Indeed, the only testimony specifically on point comes from Cooper, who explained that from the documentation available, he could tell that capital gains taxes were paid by the parties during the relevant period, but he could not trace the *source* of funds for the

C.    *Breach of Fiduciary Duty*

In his final appellate challenge to the trial court's ruling, Furrh focuses on the trial court's finding that Furrh breached a fiduciary duty to Frick in managing her separate property funds in violation of section 721 by placing a substantial amount of Frick's assets in the Jack White account under the belief that those funds would become community property "with what he hoped would be a windfall."[35]  As we have explained, although the trial court found a breach of fiduciary duty, it did not order any remedy, as it found that Frick did not lose any money and had been able to trace her separate property funds to the purchase of the San Antonio and California St. properties despite the fact that those funds were comingled in the Jack White account.

Furrh argues that on either of two separate grounds we should reverse the finding that he breached a fiduciary duty to Frick.  First, he contends that the issue of whether he breached a fiduciary duty to Frick was not properly before the trial court because it was not within the scope of issues set forth in the parties' list of stipulated issues for the trial court to decide.  Second, he argues that the ruling was flawed on the merits, as it is not

_____

payments.  As Cooper's analysis shows, there was very little community property income from 1995 to 1999, so that the majority of expenses were necessarily paid by the parties' separate property funds.

[35]    "Section 721 . . . creates a broad fiduciary relationship between spouses in their transactions with each other.  This relationship 'imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.' "  (*In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 590.)  Further, as relevant here, case law establishes that a spouse's fiduciary duty includes the duty of fair dealing in handling the separate property of the other spouse.  (*Walker*, *supra*, 138 Cal.App.4th at p. 1419.)

supported by substantial evidence and is contrary to law. We discuss each argument in turn.

As to whether the issue of Furrh's breach of fiduciary duty was properly before the trial court, we conclude that the trial court properly ruled during trial that although a statutory claim for breach of fiduciary duty under section 721 was not one of the stipulated reserved issues for trial, the factual question of whether Furrh breached his fiduciary duty in the management of Frick's separate property funds was nevertheless subsumed in the issue of whether Frick was entitled to reimbursement under section 2640 for separate property funds traced into the purchase of the San Antonio and California St. properties. Specifically, a party seeking reimbursement under section 2640 may attempt to set aside an interspousal transaction accomplished in breach of the fiduciary duty owed under section 721. (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 629; *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293-294.) As part of Frick's attempt to trace her separate property into the Jack White account and then into the purchase of the San Antonio and California St. properties, Frick argued that because Furrh had transferred Frick's separate property funds into the Jack White account in violation of his fiduciary duty to her, Furrh could not claim that Frick's separate property funds were transmuted to community property when they were comingled by Furrh in the Jack White account. Indeed, Frick made that specific argument in her trial brief, and she continues to advance that argument on appeal. Therefore, the trial court was correct to rule that Furrh's breach of fiduciary duty was within the scope of the issues before it, but only to the extent it was relevant to deciding the section 2640 reimbursement claim.

However, as it turned out, Frick's claim that Furrh breached his fiduciary duty in handling her separate property funds in the Jack White account was *not* necessary or relevant to the trial court's decision awarding reimbursement under section 2640. Frick succeeded in tracing her separate property contribution to the purchase of the San Antonio and California St. properties without relying on her claim that Furrh breached his fiduciary duty. The finding that Furrh breached his fiduciary duty might have been relevant if Frick had not otherwise succeeded in tracing her separate property contributions to the Jack White account, but that was not the case here, and therefore, the finding on Furrh's breach of fiduciary duty had no effect on the outcome of this case.

"[E]rrors favorable to an appellant are not subject to review. It is 'well settled by statute, case law, and logic that only an aggrieved party may bring the appeal.' " (*In re Marriage of Brockman* (1987) 194 Cal.App.3d 1035, 1041.) A party is aggrieved if his "rights or interests are injuriously affected." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737.) Here, the trial court's finding on the breach of fiduciary duty did not cause any injury to Furrh as it did not impact the ruling awarding reimbursement to Frick under section 2640. Therefore, we need not, and do not, review Furrh's appeal of the trial court's finding, as it is not properly before us on appeal. Moreover, even were we to conclude that the breach of fiduciary duty issue was properly before us, we would nevertheless decline to reach it, as we would be issuing an unnecessary advisory opinion with no practical effect on the parties' rights. (See *In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 398 [when appellants did not demonstrate they were aggrieved by the issue presented to the appellate court for resolution, the court declined to reach the issue

because "[a]ny disposition of this issue would thus constitute no more than an advisory opinion"].)

## III.

## FRICK'S CROSS-APPEAL

We now turn to Frick's cross-appeal from the trial court's ruling that Furrh established he was entitled to reimbursement under section 2640 for a separate property contribution of $50,000 to the 1994 purchase of the Borrego Springs property by Frick's parents. Frick contends that the trial court erred in ruling that Furrh was entitled to reimbursement under section 2640 because that provision does not apply to transactions before marriage. As we will explain, we agree.

There is no dispute that the Borrego Springs property was owned by Frick as her *separate property* after she inherited it from her parents. Accordingly, the applicable part of section 2640 is subdivision (c), which describes the circumstances under which one spouse may obtain reimbursement for a contribution of funds to the acquisition of the other spouse's *separate property* asset. Specifically, section 2640, subdivision (c) provides in relevant part that "[a] party shall be reimbursed for the party's separate property contributions to the acquisition of property of the other spouse's separate property estate *during the marriage*, unless there has been a transmutation in writing . . . ." (Italics added.) Applying that statutory provision, the trial court's ruling that Furrh was entitled under section 2640 to recover the $50,000 contribution to Frick's parents to purchase the Borrego Springs property is in error for two separate reasons.

53

First, according to Furrh, he contributed $50,000 to the purchase of the Borrego Springs property *before* the parties' marriage, at a time when the parties had not even discussed marriage. The plain language of section 2640, subdivision (c) states that it applies only to contributions to the acquisition of property *during* the marriage. Because Furrh contributed the funds to the purchase of the Borrego Springs property *before* the parties were married, he may not seek reimbursement under section 2640, subdivision (c). Furrh makes a weak attempt to argue that section 2640 applies even though the parties were not married at the time the Borrego Springs property was purchased because they were not simply dating — they were living together. Furrh cites no authority in support of his argument, and it is contrary to the plain language of the statute which refers to property acquired "during the marriage." (§ 2640, subd. (c).)

Second, section 2640, subdivision (c) applies to contributions made "to the acquisition of property *of the other spouse's separate property estate*." (*Ibid*., italics added.) However, Furrh did not make the contribution of $50,000 to the purchase of any property by Frick's "separate property estate." (*Ibid*.) Instead, he made the contribution to Frick's *parents*, who were the buyers of the Borrego Springs property on behalf of their trust. Frick did not take ownership of the Borrego Springs property until after her parents died. Although, Frick was apparently the sole beneficiary of her parent's trust, there is no merit to Furrh's argument that Frick's status as a beneficiary means that the Borrego Springs property should be treated as having been part of Frick's separate property assets at the time of the 1994 purchase. Frick's interest in the trust's assets did not vest until after her parents died and the trust became irrevocable. (*Aulisio v. Bancroft* (2014) 230

54

Cal.App.4th 1516, 1525 [" 'When the settlor dies, the trust becomes irrevocable, and the beneficiaries' interest in the trust vests.' "].)[36]

As section 2640, subdivision (c) is not applicable to Furrh's premarriage contribution of $50,000 to the purchase of the Borrego Springs property by Frick's parents in 1994, we reverse the trial court's order awarding Furrh reimbursement in the amount of $50,000.

---

[36] We note that in the trial court, Furrh appeared to argue in the alternative that if section 2640 were not applicable, the trial court should award $50,000 to him under the theory that he had a claim for a constructive trust against Frick. Furrh does not pursue that argument on appeal, and we accordingly do not address it here. We also note that the constructive trust claim does not appear to be within the scope of the parties' stipulated reserved issues for trial.

DISPOSITION

The trial court's order awarding Furrh reimbursement in the amount of $50,000 for his contribution to the purchase of the Borrego Springs property is reversed. In all other aspects the judgment is affirmed. Frick shall recover her costs on appeal.[37]

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.

---

[37] Frick makes a cursory request for an award of attorney fees on appeal pursuant to sections 271 and 2030, which she does not support with any written argument. We hereby deny the request. We also deny Frick's request that we strike Furrh's reply brief.